THE HELEN KELLER.

THE CONTINENTAL.

CHANDLER et al. v. THE CONTINENTAL.

NEW HAVEN STEAM-BOAT CO. v. THE HELEN KELLER.

(District Court, S. D. New York. April 2, 1892.)

COLLISION—STEAM AND SAIL—OVERTAKING STEAMER—LUFF—LOOKOUT.

A schooner westward bound, in Long Island sound, ported and went to the north-ward upon the anchorage ground south of Westchester creek, for the purpose of coming to anchor. A steamer was coming up astern, and overtaking the schooner. The latter, at the time she ported, was 400 or 500 yards distant from the steamer, nearly ahead, and not over one and one-half points on the latter's port bow. Not recognizing the intention of the schooner to anchor, the steamer also ported, and the vessels came into collision within the anchorage ground, and outside of the steamer's ordinary course. *Held,* that the porting of the schooner presented no difficulty to the steamer, had she been properly observed and timely measures taken to go astern, and that the steamer was solely in fault.

In Admiralty. Cross-libels for damages occasioned by collision.
*Wing, Shoudy & Putnam* and *Mr. Burlingham,* for the Helen Keller.
*A. C. Chapin* and *Mr. Kelly,* for the Continental.

BROWN, District Judge. In the afternoon of October 23, 1890, in rainy weather and a strong east wind, as the schooner Helen Keller, westward bound in Long Island sound, was turning to the northward and eastward into the cove off the mouth of Westchester creek, a few hundred feet to the westward of Old Ferry point, she came into collision with the steam-boat Continental, also bound westward and overtaking her; both vessels suffered damages, for which the above libel and cross-libel were filed.

The Continental had been previously going at the rate of about 11 knots; the Keller, at the rate of about 6 knots. The Continental passed Old Ferry point somewhat nearer the shore than the schooner passed; but there is so much difference in the estimates of the different witnesses, that I am unable to determine the distance with any precision, nor does it seem to be material to do so. Shortly before the schooner luffed to the northward in order to go to her anchorage ground, the course of the Continental had been directed half a point to the northward of her usual course, for the purpose of passing the schooner on that side. Several of the Continental's witnesses, including the master who was in the best place for observation, testify that at the time when they observed the schooner luffing across the course of the Continental, the schooner bore about one point and a half on the Continental's port bow. The officers of the latter estimate the schooner at that time to be only five or six hundred feet distant. The witnesses on the schooner say that they were from a quarter to a half mile ahead of the Continental; and that the Continental was so far behind that there

was plenty of room for her to go to the southward and astern of the schooner. The officers of the Continental, on the contrary, contend that they were so near the schooner that there was no room for them to go astern, and that their only course was to hard a-port, which they did, hoping that the schooner would keep off, and that nothing more than a harmless side-long blow would ensue. The Continental also stopped her engines for a short time, but then went ahead again. The collision was at about right angles; and very soon afterwards, as all the witnesses agree, both vessels went ashore on the flats.

The circumstances leave no doubt that the place of collision was within one of the anchorage grounds prescribed by the secretary of the treasury in the East River under the act of congress approved May 16, 1888; namely, "On the north side of the channel, north of a line between Old Ferry point and Hunt's point." The flats where the vessels grounded were over 600 feet to the northward of the prescribed line; and as the vessels, according to the testimony of the witnesses, could not have drifted that distance after the collision before grounding, it is evident that the collision took place within the limits of the anchorage ground to which the schooner had a right to go. As by the ordinary rules the overtaking steamer was bound to keep out of the schooner's way, the only material question is, whether when the schooner turned to go to the anchorage ground, there was reasonable room for the steamer to avoid her without going within the anchorage limits.

The circumstances show that the estimates of the schooner's witnesses as to the distance of the Continental when the schooner luffed, must be more nearly correct than the estimates of the steamer's witnesses. There is much less liability to mistake in the officers' estimate of the *bearing* of the schooner off their port bow than of the number of feet between them. The estimate to which the master of the Continental testifies, that the schooner, when he observed her luffing, was 400 or 500 feet off to port of his own course, and from 400 to 600 feet ahead of him, is altogether inconsistent with the bearing stated by him. Upon a bearing of a point and a half to port, the most to port stated by any of the witnesses, the schooner must have been three and one-quarter times as far ahead as she was to port. Supposing her to have been 400 feet to port of the schooner, the smallest distance estimated, her distance ahead must, therefore, have been 1,300 feet, or about a quarter of a statute mile. If she was 500 feet to port, she must have been considerably more than a quarter of a mile ahead. If, however, she bore only one point off the port bow of the Continental, and was only 225 feet to port of her, as estimated by Frye, a disinterested witness and captain of the schooner Olive nearly abreast of the Continental, she must still have been over 1,000 feet ahead of the Continental. Frye testifies further that the schooner was directly ahead of him and 400 or 500 yards distant from the Continental when she luffed.

The collision was at nearly right angles; and the Continental was then heading about N. N. W. It follows that the latter must have changed her course about five points and a half, and the schooner,

about 13 or 14 points. Assuming that the schooner had changed two points before her luffing was discovered by the steamer, when the helm of the latter was put hard a-port, the schooner must have changed about 11 or 12 points while the Continental was changing about five points and a half. Such a change by a steamer of the size of the Continental, some 300 feet long, could not in ordinary experience be made in going less than from 1,000 to 1,500 feet; and the schooner in turning nearly a semi-circle, aided by the flood-tide which there runs to the eastward, herself also approached the steamer before collision. Moreover, the schooner, according to the testimony of the steamer's witnesses, must have been at least 500 feet outside the line running from Old Ferry point to Hunt's point when she began to luff, and according to her own testimony, still more than that. In traveling her semi-circular course to the place of collision, she must have run from 900 to 1,000 feet; and as her speed was diminishing all the time, she must have occupied about one and a half minutes at least; and the steamer during this interval could not have gone less than 1,200 feet.

From the direct testimony, therefore, as well as from the circumstances of the navigation, I have no doubt that when the schooner was seen to be luffing to the northward, she was at least 400 or 500 yards distant from the steamer, and nearly ahead of her, as Frye testifies. In this situation the luffing of the schooner to go to her anchorage ground presented no difficulty to the steamer in the performance of her duty to avoid the schooner, had the latter been properly observed, and timely measures taken to go astern of her. There was no breach of duty on the part of the schooner, therefore, in luffing when she did. Had the steamer even kept her course instead of following up the schooner to starboard, she must inevitably have gone astern of the schooner, as Frye also testifies. For the steamer was not going at twice the schooner's speed, and she could have slowed if necessary; while with a little starboarding of her wheel, which there was nothing to prevent, she would have given the schooner a wide berth.

The only explanation suggested why the steamer went to the northward instead of the southward is, that she misconceived the schooner's purpose; and this seems certain from the fact that when the order hard a-port was given, the officers did not suppose the schooner was going to anchor. They all testify that they had not observed the taking in of a number of the schooner's sails, which had been going on for some time previous, though this had been noticed by Frye on the Olive, and the intent of the schooner to anchor recognized by him. As there was no necessity for the steamer to take the course to the northward, and as that course carried her, moreover, upon the schooner's anchorage ground, and out of the way of the steamer's proper and natural course, a deviation which the schooner had no reason to anticipate, I must find the schooner exempt from blame, and the fault to rest with the steamer alone. A decree may be entered accordingly, with costs.